**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
COMMISSION TO DETERMINE COMPENSATION**

| | |
|---|---|
| ROCKIES EXPRESS PIPELINE, LLC : | |
| : | |
| Plaintiff, : | |
| : | Case No. 2:08-CV-554 |
| vs. : | |
| : | |
| 4.895 ACRES OF LAND, MORE OR LESS, : | |
| IN BUTLER COUNTY, OHIO : | |
| (PIPELINE RIGHT-OF-WAY SERVITUDE) : | |
| JACK AND BRIGETTE CORNETT : | |
| AND UNKNOWN OWNERS, et al. : | |
| : | |
| Defendants. : | |

## REPORT AND RECOMMENDATIONS OF THE COMMISSION TO DETERMINE COMPENSATION WITH RESPECT TO THE PROPERTY OWNED BY ANNA ALEXANDER

### I. Introduction and Relevant Standards

A hearing was held by The Commission to Determine Compensation in the case of Rockies Express Pipeline, LLC v. 4.895 Acres of Land, More or Less in Butler County, Case No. 2:08-CV-554, on May 19-21, 2010, to consider compensation due Anna Alexander, owner of 82.10 acres in Warren County, Ohio. The Commission conducted its deliberations on May 27, 2010.

In determining the highest and best use prior to the taking of the easement, the Commission applied the standard that the use must be "financially feasible, lawful, physically able and reasonably capable of being accomplished within a reasonable time."

Testifying on behalf of the Defendant were Dr. Stanley Alexander, Mr. Jerry Fletcher, Mr. David Reibold, Mr. Michael Schueler, Ms. Jill Davis, Ms. Pat Howell, and Mr. Gary Holland. Testifying for the Plaintiff were Mr. David Oakes, Mr. James Herbig, Mr. Michael Brantley, and Mr. James Hobstetter.

1

The subject site contains 82.10 acres that is used for agricultural purposes and as a residential homestead for Dr. Stanley Alexander and his family. The tract is improved by a residence, a horse barn, and accessory structures. A portion of the tract is farmed, and other portions are used as pasture for horses. The property is essentially rectangular in shape with the exception of three lot cutouts on the western border, which were sold approximately 13 years ago. Primary access to the property is from Springboro Road. The property is presently encumbered by two easements containing gas transmission lines: one running diagonally across the southeast corner of the property, and the other running northeast and then north from the southwest corner of the property. It appears from the evidence that these two easements contain a total of five existing natural gas transmission lines.

The acquisition being sought by Rockies Express Pipeline, LLC ("REX") consists of a 3.16 acre permanent easement extending 2,733+/- feet northeast through the southern portion of the property. A 4.73 acre temporary construction easement is located adjacent to the easement. Additionally, a temporary workspace of 0.99 acres is sought to assist in the construction of the pipeline itself.[1]

In conducting its deliberations, the Commission adhered to the instructions provided to it by the Court. Included in these instructions were the admonitions on evidence, which included the direction that "the Commission is to consider only the evidence in the hearing." The Court also advised the Commission that it is not limited to the mere statements of the witnesses but is also permitted to draw, from the facts that the Commission finds have been proved, such reasonable inferences as seem justified in light of the Commissioners' own experiences, reason, and common sense. Court Order dated February 12, 2009, p. 11.

In reaching its conclusions, the Commission considered the testimony of each witness and all of the exhibits admitted into evidence.

---

[1] The appraisals (Herbig and Fletcher) of the parties differed as to the size of the permanent easement, the size of the temporary easement, and the size of the additional workspace. The Herbig appraisal (Pl's Exhibit 1) found a total of 8.88 acres within the easement areas, while the Fletcher appraisal (Def's Exhibit 1) found 6.88 acres within the easement areas. The Commission used the figures in the Herbig appraisal for these items because the Herbig figures were more generous to the Defendant and were supported by the testimony of the parties at the hearing and by Exhibit A to the Herbig appraisal. It appears that at least some of the figures in the Fletcher appraisal were based upon only one parcel of the two parcels of Dr. Alexander's land that are subject to the right-of-way.

## II. Report of the Commission

**Pre-Taking Highest and Best Use.**  The evidence was controverted on the pre-taking highest and best use for the property.  Experts for the Defendant (Fletcher, Reibold, and Schueler) all testified that the highest and best use prior to the taking was either for present residential development or to hold for residential development within the foreseeable future.  The Plaintiff's expert appraiser, Mr. Herbig, concurred with the Defendant's experts that the highest and best use prior to the taking was to continue with the present interim use (agriculture) until redevelopment for single family use is financially feasible.  (Pl.'s Exhibit 2).  Contrary to the other witnesses, Mr. Oakes testified that the highest and best use prior to the taking was agricultural.  Mr. Oakes testimony was credible and he justified his opinion by the lack of access from the property to a high-volume thoroughfare and the lack of demand for residential development due to the current economic conditions.  However, based upon the testimony of the other witnesses, the present development in the area, and the likely demand in the area when economic conditions improve, the Commission concluded that a preponderance of the evidence supported the conclusion that the highest and best use prior to the taking was to hold for future residential development and that such development could occur within a reasonably foreseeable time period.

**Post-taking Highest and Best Use**

Mr. Fletcher, Mr. Reibold, and Mr. Schueler all testified that the presence of the REX pipeline would alter the highest and best use of the property from hold for residential development to agricultural.  Neither of the Plaintiff's witnesses, Mr. Herbig or Mr. Oakes, believed that the presence of the REX pipeline would change the highest and best use of the property.

Mr. Fletcher, the Defendant's expert appraiser, testified that his opinion was that the REX pipeline would limit the highest and best use of the property to agricultural use.  He admitted, however, that his opinion was based primarily on discussions with three developers, two of whom were also witnesses for the Defendant (Reibold and Schueler), and he offered little additional independent basis for his opinion.  In addition, Mr. Fletcher did not incorporate available sales of properties encumbered by existing gas lines as part of his analysis nor did he conduct a paired sales analysis, although he attempted—in the Commission's opinion unsuccessfully—to discredit the utility of a paired-sales analysis in this context.  He also admitted that he did not look at any recent sales in the residential development immediately to the south (Stirling Manor Estates) to see if they had been affected by the existence of the natural

gas transmission lines running through a portion of the development. Similarly, he did not adequately explain why the Shaker Run development, which was developed over a number of natural gas pipelines, was distinguishable from the present property in terms of stigma (although he explained why it was different in other ways).

Mr. Reibold, a local developer, similarly testified that the REX pipeline would alter the highest and best use of the property from hold for residential development to agricultural. He based his opinion primarily upon the presence in the area of land suitable for development that did not have natural gas transmission pipelines running across the property. He said that in the current environment, there was sufficient suitable land that a developer would not develop land that had the "stigma" of the REX pipeline.

Mr. Reibold, however, provided little support for the presence of a stigma on the property. The internet search he performed was of little value to the Commission in evaluating his opinion on the effect of stigma caused by the REX pipeline. The limited nature of the search, the search terms, and the search site all were factors in reaching this conclusion. More importantly, Mr. Reibold was ineffective in explaining why the REX pipeline would engender sufficient stigma to change the highest and best use of the property when the existing five natural gas distribution pipelines would not. He acknowledged that the area affected by the other pipelines could be developed in the absence of the REX pipeline, but did not distinguish why the REX pipeline would alter that conclusion.

Mr. Schueler, also a local developer, concurred with Mr. Fletcher and Mr. Reibold that the presence of the REX pipeline altered the highest and best use of the property from hold for residential development to agricultural. He testified that prior to the REX pipeline, the land would have been likely to have been developed as a successful subdivision similar to the development to the immediate south. He stated that the REX pipeline was a "bloody gash" across the property that would change its development potential because of the stigma attached to the property resulting from the pipeline.

During his testimony, however, Mr. Schueler failed to adequately explain why the existing pipelines did not also create a similar stigma. He said that potential homebuyers in a development would not be as concerned about existing pipelines because "they had been there a long time," but this was not convincing to the Commission. In fact, it was the Commission's conclusion that the age of the existing pipelines (some apparently more than 50-60 years old) would render them more suspect and perhaps more likely to carry the stigma of possible rupture. Mr. Schuler's testimony was also somewhat evasive when cross-examined on whether the

portion of the property containing the existing pipeline easements could be developed and how the development potential of that property differed from that affected by the REX pipeline.

Mr. Herbig testified that he did not believe that the REX pipeline would affect the highest and best use of the land. Mr. Herbig's testimony was supported by a comparable sales analysis of the Stoneridge Development and the Hawthorne Hills development. He testified that he believed that the land remained suitable for development with both the existing pipelines and the Rockies pipeline.

In the final analysis the Commission concluded that the Defendant had not proved by a preponderance of the evidence that the presence of the REX pipeline would change the highest and best use from hold for residential development to agricultural. Most importantly, none of the Defendant's experts offered convincing testimony as to why the addition of the REX pipeline would alter the highest and best use of the property <u>given the existence of five existing natural gas pipelines already present on the property</u>. Although the Rockies pipeline affects a greater portion of the property than the existing pipelines and is of a greater diameter, none of the Defendant's witnesses provided convincing testimony as to why the existence of the REX pipeline would significantly increase the stigma, if any, already present from the five natural gas distribution pipelines already on the property. Moreover, a portion of the Defendant's property directly affected by the existing pipelines has already been sold for residential development and has three existing residences on or closely adjacent to the pipelines. Dr. Alexander admitted there was no known reduction in the sales price of these properties due to the presence of the pipelines. Further, Mr. Oakes offered convincing testimony and subdivision concepts demonstrating how the Alexander property with the REX pipeline could be developed within the existing zoning regulations, which was not discredited upon cross-examination or rebuttal or countered by credible opposing land plans. The Commission was ultimately convinced by a preponderance of the evidence that the marginal effect of the REX pipeline did not alter the highest and best use of the property already burdened by five natural gas transmission pipelines.

**Pre-Take Market Value:**

Land

The Defendant's appraiser, Mr. Fletcher, testified that the pre-take value of the land was $16,000 per acre. He based his opinion on four comparable sales, and the Commission found both his opinion and the comparable sales to be persuasive and credible. Mr. Herbig, the Plaintiff's appraiser, found that a portion of the Alexander property (23.929 acres) had a pre-take value of

$18,000 per acre, and the balance (58.171 acres) had a value of $16, 000 per acre.  Although the average of Mr. Herbig's comparable sales was only $10,646, the Commission finds that the more relevant comparable sales had a higher value, particularly those in Clearcreek Township, where the Alexander property is located.  Based upon the testimony of both appraisers and the exhibits supporting the testimony, the Commission finds the pre-take value of the property to be $16,500 per acre.

Improvements

No testimony was offered as to any effect of the REX pipeline on existing improvements to the property.  The Commission concludes that the property was already encumbered by subsurface fuel lines prior to the REX pipeline and there was no evidence adduced to allow the Commission to conclude there was any reduction in value to the improvements.

Compensation for Lost Value of Improvements:         $   0.00

**Damages from the Permanent, Non-Exclusive Easement, the Temporary Easement and the Work Agreement:**

Permanent, Non-Exclusive Easement

The Commission determined damages to the 3.16 acres subject to the permanent, non-exclusive easement by multiplying the acreage by the market value of the land area then discounting that number by the percentage of use that is lost.  Mr. Herbig testified that the value of the easement is 50% of the fee simple value of the land area (Plaintiff's Exhibit 1, page 26).  This figure was based upon the loss of value of the subsurface rights as well as the continued ability of the landowner to use the property for agricultural and some development purposes.  Mr. Fletcher opined that the loss in value of the permanent, non-exclusive easement was 100% of the land value.  However, he was unable to support this figure except to cite to "his general experience with contractors," and remarked that he "doesn't trust contractors to do what they agree to do," which the Commission does not find sufficient to credit his testimony.  In fact, Mr. Fletcher admitted that if the right-of-way is restored as promised in the AIMA, a 50% loss would be appropriate.  Given the continued uses available to the property owner of the land subject to the easement and the credibility of Mr. Herbig's testimony, as well as evidence that agricultural use has been reestablished over at least a portion of the surface area of the easement, the

Commission finds the reduction in the value of the land subject to the permanent non-exclusive easement to be 50%.

The Market Value of the Permanent, Non-Exclusive Easement is calculated as follows:

    3.16 acres x $16,500 per acre x 50%:        $26,070.00

Temporary Takings

The property is subject to a 4.73 acre temporary easement and a 0.99 acre additional workspace agreement. Mr. Herbig testified that an annual rate of return of 10% is applicable for the temporary work easements, a figure on which the Defendant's appraiser, Mr. Fletcher, concurred. (Plaintiff's Exhibit 1, Page 26; Defendant's Exhibit 1, p. 73). The Commission finds a reasonable rate of return of 10% to be appropriate.

The resulting compensation is calculated as follows:

| | |
|---|---|
| 4.73 acres x $16,500 per acre @ 10% for 2 years: | $15,609.00 |
| 0.99 acres x $16,500 per acre @ 10% for 2 years: | $ 3,267.00 |
| Total Compensation for Temporary Takings: | $18,876.00 |

Damages to the "Residue" of the Property

In assessing the issue of the damages to the residue of the property, the Commission remained mindful that the Sixth Circuit has held that the apprehension of injuries created by the presence of such things as overhead power lines, for example, is founded upon the practical experience and "may be taken into consideration" in determining market value of the affected land. *United States of America v. 6.24 Acres of Land,* No. 95-3183 1996 U.S. App. LEXIS 27761 (6th Cir. Oct. 22, 1996). Diminution of value caused by fear may be recoverable where such fear affects the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, assuming buyers and sellers of ordinary prudence are knowledgeable and are not motivated by speculation or conjecture. *United States of America v. 760.807 Acres of Land,* 731 F.2d 1443 (9th Cir. 1984).

7

The Defendant's evidence was almost entirely limited to the issue of whether the highest and best use of the property was altered by the REX pipeline; the Defendant presented almost no evidence, hypothetical or otherwise, as to the diminution in value that would result to the residue of the property if the REX pipeline did not change the highest and best use of the property, as the Commission has found. Mr. Reibold did testify, however, that he believed that the REX pipeline would cause the residue of the land to decline by 15% if the land could still be developed, but offered no support for this conclusion.

On the other hand, Mr. Herbig testified that the REX pipeline would cause no loss in value to the residue of the property. He provided comparable sales analyses based upon the Stoneridge developments and the Hawthorne Hills development, which found no difference in price between those properties with a natural gas transmission pipeline and those without. Upon cross-examination, however, Mr. Herbig admitted that he didn't know the size of the pipeline in the Stoneridge development and admitted that he assumed that the size of the pipeline made no difference as to whether there would be a loss in value. Moreover, the Commission concluded that the success of the first Stoneridge development (without a pipeline) would have a mitigating effect on the potential loss of value caused by the pipeline in the second, immediately adjacent, second Stoneridge development.

Keeping in mind the guidance of the cases cited previously, along with the summary testimony of Mr. Reibold, the Commission finds that the existence of the REX pipeline has caused damage to the residue of the property. The damage does not rise to the level where a change to the highest and best use results, and the damage is significantly mitigated by the fact that there are already five existing natural gas transmission pipelines on the property. However, these pipelines are smaller than the REX pipeline and affect a smaller portion of the overall property. Recognizing that the property can still be developed, the Commission nonetheless recognized that the existence of the REX pipeline would decrease a potential developer's flexibility and possible development alternatives. In addition, the existence of an additional natural gas transmission pipeline would (marginally) add to the stigma on the residue. Therefore, the Commission found a 7% reduction in value caused by the REX pipeline.

The loss in land value is calculated as 78.94 acres x $1155.00 ($16,500 x .07) per acre totaling $91,175.70.

      Total Compensation for loss in Land Value to the Residue:    $91,175.70

**Loss of Trees**

Neither party presented any evidence as to the loss of value or monetary damage resulting from the trees that were cut down on the pipeline right of way.  The sole testimony during the parties' cases in chief relating in any way to the value of lost trees was by Mr. Herbig, who testified on cross-examination that the removal of trees as a result of the pipeline may cause either a loss in value or an increase in value depending upon the circumstances.  The Defendant attempted on rebuttal to offer the testimony of Dr. Alexander as to the value of the trees, but this testimony was excluded by the Chair as impermissible rebuttal testimony.  Because there was no evidence presented as to the value of trees removed as a result of the REX pipeline, the Commission found that there was no loss in value.

      Compensation for lost value of trees removed:        $0.00

**<u>Damage Caused by Failure to Remove Rocks</u>**

The majority of the testimony at the hearing dealt with the alleged failure of REX to remove rocks from the right-of-way as required by the Agricultural Impact Mitigation Agreement ("AIMA") (Plaintiff's Exhibit 9) or, as argued by the Defendant, a separate contract entered into between REX and the Alexanders embodied in the Right-of-Way/Damage Claim Voucher ("Voucher") (Plaintiff's Exhibit 13).  The evidence presented by the parties sharply conflicted on the prevalence, distribution, depth, nature, and size of the rocks remaining on the property following restoration and mitigation efforts by REX, and the extent to which, if at all, the rocks interfered with the Defendant's intended use of the land as a horse pasture.

<u>The "Voucher"</u>

The Commission was not convinced by a preponderance of the evidence that the Voucher imposed any additional obligations on the Plaintiff with regard to rock removal.  The relevant language of the Voucher is broad, is specifically limited to "(t)he ground surface," makes no specific reference to rock removal, and is consistent with REX's obligations under the AIMA.  Moreover, there was testimony, substantially uncontradicted, that the focus of the Voucher was on compaction rates, an issue on which the Voucher clearly did impose obligations different from the AIMA, and not to change REX's obligations with respect to rock removal.

Moreover, even assuming that the Voucher language requiring REX to return the ground surface in the Pipeline Easement Areas to "pre-construction grades and conditions" imposes additional obligations upon REX, the language is qualified by the phrase, "as is practicable."  The Commission found that the methods used by REX to return the land to pre-construction grades and conditions were all that could "practically" be required of REX at the relevant time.

9

Among the measures taken: the topsoil and subsoil were separated, a rock picker and pulverizer was used, rock collection "rakes" were driven across the property numerous times, and rocks over 3" were even hand-removed. Although Mr. Brantley admitted on cross-examination that other methods of rock removal (such as building three piles of refuse from the excavation) were "possible," no testimony was presented by the Defendant that such alternative methods were "practicable." The Commission found that the Defendant did not meet its burden to establish by a preponderance of the evidence that REX did not do everything "practicable" to meet its obligations imposed by the Voucher.

The AIMA

The AIMA imposes comprehensive obligations upon REX to mitigate the impact of pipeline excavation, and to ease the inevitably difficult process of condemnation and pipeline installation. Among these are the obligations to deliver the AIMA to the landowner early in the process and to provide readily available access to REX officials and other inspectors, including the Agricultural Inspector. *See e.g.*, AIMA p. 1, Plaintiff's Exhibit 9, paragraph A (the AIMA shall be provided to the landowner prior to obtaining an easement); AIMA p. 2, paragraph H (prior to construction, the landowner shall be provided with an address and telephone number that can be used to contact REX); AIMA p. 3 (The Agricultural Inspector shall maintain contact with the affected landowners). While not necessary to the Commission's opinion, the Commission found by a preponderance of the evidence that REX failed to comply with many of the provisions of the AIMA designed to enhance cooperation between the landowner and REX and to eliminate or mitigate conflict and disagreements. It is the Commission's view that if REX had complied with the AIMA in these respects, and others, its relationship with Dr. Alexander, and Dr. Alexander's satisfaction with the process, would have been considerably improved.

Relating to the removal of rocks on the premises, the AIMA provides in paragraphs 5.A. and 5.B. :

> A. Before replacing any topsoil, all rocks greater than 3 inches in any dimension will be removed from the surface of all exposed subsoil (i.e., working side and subsoil storage areas); and the top 42 inches or the actual depth of the top cover, whichever is less, within the pipeline trench, bore pits, or other excavations shall not contain rocks of any greater concentration or size than existed prior to the pipeline construction.

> B. All rocks greater than 3 inches in any dimension will be removed from the topsoil surface using a rock rake following final restoration unless undisturbed areas adjacent to the ROW can be shown to contain similar concentration and size.

As mentioned previously, the testimony relating to the presence, distribution, depth, nature, and size of rocks remaining in the right-of-way after restoration was extensive and sharply conflicting.  Moreover, there was considerable testimony as to the effect of the remaining rocks on Dr. Alexander's intention to use a portion of the right-of-way as a horse pasture.  The Defendant presented three witnesses, in addition to Dr. Alexander, who testified both as to the existence and prevalence of rocks in the pasture and the danger presented to horses.  All of Dr. Alexander's witnesses, however, were persons who had pre-existing relationships with Dr. Alexander.  The Plaintiff countered with two witnesses (and numerous photograph exhibits) who presented directly conflicting testimony as to the prevalence, size, and nature of the rocks, and of their possible danger to Dr. Alexander's horses.  Only the Plaintiff's testimony and exhibits were based upon an examination of the property when representatives from both parties were present.  The Commission did not have the benefit of a site visit; the Defendant had moved for a site visit that was granted by the Chair, but the visit was canceled over the objection of the Plaintiff upon motion of the Defendant shortly before the hearing. In retrospect, the Commission feels a site visit would have enhanced the Commissioners' ability to understand the testimony and evidence.

Based upon the evidence presented, the Commission would not presently find that the Defendant has established by a preponderance of the evidence that REX has violated paragraph 5 of the AIMA, or that the right of way cannot presently be used by Dr. Alexander as a horse pasture, although the evidence on both sides was substantial and credible.  However, the Commission finds it unnecessary to decide this issue.[2]  The AIMA gives the landowner the right for a period of 3 years to require that REX conduct remediation to the standards in the AIMA, of which more than two years remain.  The Agricultural Inspector and the FERC representative are contractually appointed as the initial arbiters of REX's compliance with the AIMA.  *See e.g.*,

---

[2] Were the Commission to decide that the right-of-way could not reasonably be used to pasture Dr. Alexander's horses as a result of rocks present in the right-of-way, damages would not necessarily be measured by the cost of restoration unless the cost of restoration was less than the loss to Dr. Alexander of his ability to pasture his horses in the right-of-way. See Supplemental Order of Judge Frost, p.2, rejecting the application of *Martin v. Design Construction Services, Inc.*, 121 Ohio St. 3d 66 (2009).  Dr. Alexander provided no testimony as to what this loss in value might be, and there was evidence that other pastures are, and will remain, available to pasture Dr. Alexander's horses.

11

AIMA, p. 3 ("the Agricultural Inspector shall act to assure that the provisions set forth in this document or in any separate AIMA, will be adhered to in good faith by the Company and by the pipeline installation contractor").  Testimony established that during construction and remediation neither the Agricultural Inspector nor the FERC representative stopped work or otherwise indicated non-compliance by REX with its remediation responsibilities.  To the extent, however, that the landowner either presently or in the future believes that REX is in non-compliance with the AIMA, the landowner has the right to require REX and the Agricultural Inspector to inspect the property and make a determination in the first instance as to whether there has been compliance.  Should the Agricultural Inspector and REX make a determination, with which the landowner disagrees, the landowner has the right to seek appropriate redress for violation of the AIMA.  REX has an ongoing responsibility at least for the next two years to conduct remediation to insure compliance with the AIMA.  Given this ongoing responsibility, and the ability under the AIMA for the landowner to require REX to remediate, the Commission finds that that it is premature to require REX to pay damages for remediation by a third party.

### III.    Conclusion and Recommendation

The Commission unanimously recommends that the Defendant be compensated in the total amount of which is allocated as follows between the market value of the Permanent, Non-Exclusive Easement, the market values of the Temporary Easement and the Workspace Area, and the diminution in value to the remaining land area located outside the easement area.

The Market Value of the Permanent, Non-Exclusive Easement and Damage to the Residue is Calculated as follows:

| | |
|---|---|
| Permanent Non-Exclusive Easement: | $ 26,070.00 |
| Temporary Easement: | $ 15,609.00 |
| Work Agreement: | $  3,267.00 |
| Diminution in Land Value to the Residue: | $ 91,175.70 |
| Total Recommended Compensation Due Owner: | $136,121.70 |

The conclusions of the Commission in this case were, in all relevant aspects, unanimous.

<u>/s/ Gregory M. Travalio</u>
Gregory M. Travalio
Commission Chair


<u>/s/  Craig B. Paynter</u>
Craig B. Paynter
Member


<u>/s/  G. Franklin Hinkle, II</u>
G. Franklin Hinkle, II
Member