**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
COMMISSION TO DETERMINE COMPENSATION**

| | |
|---|---|
| ROCKIES EXPRESS PIPELINE, LLC : | |
| : | |
| Plaintiff, : | |
| : | Case No. 2:08-CV-554 |
| vs. : | |
| : | |
| 4.895 ACRES OF LAND, MORE OR LESS, : | |
| IN BUTLER COUNTY, OHIO : | |
| (PIPELINE RIGHT-OF-WAY SERVITUDE) : | |
| JACK AND BRIGETTE CORNETT : | |
| AND UNKNOWN OWNERS, et al. : | |
| : | |
| Defendants. : | |

## REPORT AND RECOMMENDATIONS OF THE COMMISSION TO DETERMINE COMPENSATION WITH RESPECT TO THE PROPERTY OWNED BY JEFREY AND MAUREEN McCarty

### I. Introduction and Relevant Standards

The Commission to determine compensation in the case of Rockies Express Pipeline, LLC v. 4.895 Acres of Land, More or Less in Butler County, Case No. 2:08-CV-554, conducted its original deliberations on April 21, 2010, to consider compensation due Jeffrey and Maureen McCarty, owners of 60.00 acres in Warren County.  The recommended compensation due the McCarty's was $113,147.10 as contained within the Report and Recommendations of the Commission to Determine Compensation with Respect to the Property Owned by Jeffrey and Maureen McCarty, filed May 19, 2010, p. 10 (Doc. # 831).

The Court remanded the Report and Recommendation to the Commission for further consideration.  Opinion and Order Filed July 30, 2010, p. 9 (Doc. # 875).  The Court's remand Order stated that, "[d]epending upon the new deliberations, the new Report and Recommendation may be identical to the prior Commission decision or different than that

1

decision, in whole or in part, just as if a new jury were sent into new deliberations after the replacement of a juror."

For purposes of the Reconsideration, Commission Chairperson Travalio appointed Commissioner James N. Trifelos to replace Commissioner Craig B. Paynter. Spirited deliberations were held on August 14, 2010, from 9:30 am to 2:15 pm. The Commission approached its deliberations in three steps. First, the Commission determined the highest and best use prior to the taking of the permanent, non-exclusive easement by Plaintiff (also "REX"). Second, it evaluated whether that highest and best use had changed as a result of the taking of the easement. Finally, using its decisions in the first two steps, it decided on the difference in value of the entire McCarty property before and after the taking of the easement.

In determining the highest and best use prior to the taking of the easement, the Commission applied the standard that the use must be "financially feasible, lawful, physically able and reasonably capable of being accomplished within a reasonable time."

Testifying on behalf of the Defendants (also the "McCartys") at the Commission hearing were Jeffrey and Maureen McCarty, real estate appraiser Kurt C. Kielisch (Kielisch) and real estate broker Brad Knapp (Knapp). Testifying on behalf of REX was real estate appraiser James A. Herbig (Herbig) and George Podolski (Podolski), an employee of REX.

The subject site contains 60.00 acres that is used for agricultural purposes and as a residential homestead by Jeffrey and Maureen McCarty. The property is rectangular in shape with its primary access being from Weisenberger Road and is presently encumbered by underground fuel transmission lines at its southeastern edge.

The acquisition being sought by Rockies Express Pipeline, LLC consists of a 2.29 acre permanent easement extending 1,488+/- feet southeast through the southern portion of the property and then extending northwest 503+/- feet adjacent to the northern edge of existing underground utility line easement. A 3.43 acre temporary construction easement is located adjacent to the easement. Additionally, a temporary workspace of 1.92 acres is sought to assist in the construction of the pipeline itself.

In conducting its deliberations, the Commission adhered to the instructions provided to it by the Court. Included in these instructions were the admonitions of evidence, which included the direction that "the Commission is to consider only the evidence in the hearing." The Court also advised the Commission that it is not limited to the mere statements of the witnesses but is also permitted to draw, from the facts that the Commission finds have been proved, such reasonable inferences as seem justified in light of the Commissioner's own experiences, reason, and common sense. Court Order dated February 12, 2009, p. 11 (Doc. #597).

In reaching its conclusions, the Commission considered the testimony of each witness and all of the exhibits admitted into evidence.

## II.  Report of the Commission

**Pre-Taking Highest and Best Use.** The testimony of both parties agreed that the pre-taking highest and best is eventual residential development. The Plaintiff's expert appraiser Herbig indicated that the highest and best use of the property "As Vacant" is for future development of the site for single-family use. The highest and best use of the site "As Improved" is for continuation of the existing residential homestead improvements until a higher-density single-family residential development is financially feasible.

Both parties provided subdivision development concept plans for the property (Plaintiff's Exhibit 5 and Defendant's Exhibits 2 and 3) The Defendants additionally provided testimony that the property is suitable for development as a single-family residential subdivision. Testimony was not, however, provided to authenticate the plans or, more importantly, to establish the economic feasibility of such subdivision development. Little or no testimony was offered as to the costs of the subdivisions, such as the expense of clearing and improving the land, surveying it and dividing it into lots, advertising and selling it, and the costs of holding it. See Opinion and Order on Supplemental Instructions to the Commission, February 11, 2010 (Frost, J.) (Doc. # 795). The Commission thus finds the plans and testimony to be of little probative value or relevance.

It is therefore the unanimous conclusion of the Commission that the highest and best use of the property is for continued use of the property as a residential homestead and for agricultural purposes until such time that a future single-family residential subdivision is feasible.

**Pre-Take Market Value:**

Land

The Plaintiff offered the expert opinion of real estate appraiser Herbig to establish the market value of the land. The range in land values contained within his report is from $5,000 to $22,618 per acre with an average land value of $10,646 per acre. He concluded the land has a market value of $16,000 per acre. (Plaintiff's Exhibit 1, p. 23).

The Defendants offered their personal testimony as to the market value of the property and the testilmony of their real estate appraiser Kielisch and real estate broker Knapp. The McCartys estimated the market value of the property to be $20,000 to $22,000 per acre. Kielisch did not perform an actual appraisal of the property and simply incorporated REX's market land value of $16,000 per acre and the McCarty's estimated land value of $20,000 into his appraisal report for purposes of his analysis. (Defendant's Exhibit 8, p. 38).

Knapp also did not perform an appraisal of the property, but recognized that an appraisal had been performed in the spring of 2008 for Mr. McCarty for $18,000 to $20,000 per acre as reported to him by the McCartys. (Defendant's Exhibit 9, p. 3)

Although Mr. Herbig made upward adjustments to the value of comparable properties to arrive at a value of $16,000 per acre for Defendants' property, these adjustments were not described. However, the market value estimate of $16,000 per acre is within the range of his comparable sales analysis and is further supported by Knapp's testimony. While the owners have provided testimony as to the value, the testimony is discounted since their opinions are unsubstantiated and they were not qualified as real estate valuation experts. Kielisch's estimate is discounted as well. One of the Commissioners was inclined to give greater credibility to the McCartys and less to Mr. Herbig than the other two Commissioners; however, at the conclusion of the deliberations all Commissioners concurred that $16,000 per acre was an appropriate figure substantially supported by the evidence.

Improvements

The courts have routinely held that just compensation is measured by market value (J. D. Eaton, MAI, SRA, Real Estate Valuation in Litigation P.17 (2nd ed. 1995) citing Nichols' vol. 4, §12.01 (1990), *Harwell v. United States*, 316 F.2d 791 (10th Cir. 1963); *United States v. Miller*, 317 U.S. 369 (1943). This is the measure contained in Judge Frost's order appointing and instructing the Commission. (The commission "will award to the property owner(s) the amount of money that the Commission determines to be the fair market value of the property taken"), Court Order dated February 12, 2009, p. 19 (Doc. # 597).

Neither party provided evidence or testimony of an improved sales analysis. Construction cost estimates for the residential homestead were offered by the Defendant and relied upon by their experts. However, no credible evidence was presented by either party that supports an actual market value opinion of the improvements.

The cost approach to value provides a fee simple estimate of value: 1) estimate the reproduction or replacement cost new of the improvements; 2) estimate the accrued depreciation within the improvements; 3) deduct the estimated depreciation from the cost new estimate indicating a value of the improvements; 4) then add the value of the improvements to the underlying land value estimate indicating the total market value of the property. The Appraisal Institute, The Dictionary of Real Estate Appraisal p. 66 (4th ed. 2002)

Generally speaking, the cost approach to value is disliked by courts. The introduction of evidence regarding value based upon a depreciated cost method has been limited to special situations where cost data cannot be reliably computed under the income and sales comparison approaches to value. (J. D. Eaton, MAI, SRA, Real Estate Valuation in Litigation p.158 (2nd ed. 1995) citing *Correia v. New Bedford Redevelopment Authority*, 377 N.E.2d 909, 911 (Mass. 1978). Other courts conclude that the cost approach process should not have a place in the market value process. Id. citing *United States v. 49,375 Square Feet of Land in Borough of Manhattan*, 92 F. Supp 384, 387-88 (S.D. N.Y. 1950), *affirmed per curiam sub. nom United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952), *cert. denied*, 343 U.S. 928 (1952) (footnote omitted).

The cost approach to value should be given weight only in cases where better evidence based on actual sales is not available. Also, where reproduction costs are provided, the court should make every effort to assure the deductions for depreciation. Id. at 159 citing *United States v. 70.39 Acres of Land*, 164 F.Supp. 451, 489 (S.D. Cal. 1958).

Although unsubstantiated construction cost estimates were provided through testimony by the Defendants, the construction cost estimates were merely estimates, no depreciation analysis was undertaken, and there was no market value analysis provided by Defendants or their experts, or by the Plaintiffs for that matter. One Commissioner understood the hesitation and reluctance to utilize the cost value approach in determining market value. However, this commissioner found the uncontested cost estimate testimony, as provided by Defendants, to be evidence of minimum market value. As a result, this Commissioner concluded that the cost estimates have some bearing on the market value and was willing to find the cost estimates as providing evidence of minimum value. However, as previously discussed, no market analysis was performed and no credible evidence was ever offered indicating the <u>market value</u> of the improvements prior to the permanent easement. Moreover, no testimony was provided for the necessity of using the otherwise disfavored cost approach. As a result, the Commission concluded that using the cost approach would be pure speculation in this case.

The use of mere historical cost estimates and the lack of proper use of the cost approach combine to render use of the cost estimate incomplete and unreliable. As a result, there is insufficient evidence for the Commission to adequately assess the market value of the improvements. Without proper evidence of cost analysis, the Commission finds the cost approach to value to be an inadequate indicator of market value.

An ascertainable market value for the subject's improvements could therefore not be quantified or qualified by the Commission.

**Damages from the Permanent, Non-Exclusive Easement, the Temporary Easement and the Work Agreement:**

<u>Permanent, Non-Exclusive Easement</u>

The Commission determined damages to the 2.29 acres subject to the permanent, non-exclusive easement by multiplying the acreage by the market value of the land area then discounting that number by the percentage of use which is lost. Herbig testified that the value of the easement is 50% of the fee simple value of the land area (Plaintiff's Exhibit 1, Page 25). Knapp concluded that a value of 75% should be used (Defendant's Exhibit 9, Page 3). Again, Knapp did not perform an appraisal and his opinion is unsubstantiated. However, the Commission also found that the evidence and testimony provided by Mr. Herbig lacked clarity with regard to the impact on the surface rights of the easement area; e.g., it was not clear whether and to what extent the 50% figure included certain damage to the surface rights. Taking all of

the evidence into account, the Commission unanimously found that the value of the land subject to the permanent non-exclusive easement is concluded to be 60% of the fee simple value of the land area.

The Market Value of the Permanent, Non-Exclusive Easement is Calculated as follows:

    2.29 acres x $16,000 per acre x 60%:        $21,984.00

Temporary Takings

The property is subject to a 3.43 acre temporary easement and a 1.92 acre temporary workspace agreement. Appraiser Herbig testified that an annual rate of return of 10% is applicable for the temporary work easements (Plaintiff's Exhibit 1, p. 25). Appraiser Kielisch indicated that annual rate of 15%-20% is appropriate and concluded a rate of 20% is applicable (Defendant's Exhibit 8, pp. 37-38). The Commission finds a reasonable rate of return of between 10% to 15% to be appropriate for the type of property being rented and, based upon all of the evidence, concludes a rate of 12% is appropriate for use in calculating compensation.

The resulting compensation is calculated as follows:

| | |
|---|---|
| 3.43 acres x $16,000 per acre @ 12% for 2 years: | $13,171.20 |
| 1.92 acres x $16,000 per acre @ 12% for 2 years: | $ 7,372.80 |
| Total Compensation for Temporary Takings: | $20,544.00 |

Improvements

The Commission finds no basis for a reduction in the market value of the improvements.

The Commission heard testimony from the Defendants and their experts Kielisch and Knapp as to the reduction in value to the residential improvements due to the proposed pipe line. Two Commissioners concluded that there was no credible factual basis indicating the market value of the improvements. Equally important, there was no analysis provided that could substantiate a reduction in value for the improvements. As discussed earlier, one Commissioner was willing to use the landowner's estimates of construction cost as a basis for determining the minimum value of the improvements. The other two Commissioners concluded, however, that this was speculative at best, and that even if the cost was used as a substitute for value, there was

7

insufficient testimony that would allow the Commission to determine to what extent the improvements had been damaged.

The Commission concludes that the property was already encumbered by subsurface fuel lines prior to the REX pipe line and there was insufficient evidence adduced to allow the Commission to conclude there was any reduction in value to the improvements. There is therefore no credible basis for a reduction in the market value of the site improvements.

    Compensation for Lost Value of Improvements:    $   0.00

Land Damages

Considerable evidence was heard by the Commission as to "stigma" damages to the residue land area as a result of the pipe line easement. In assessing this issue, the Commission remained mindful that the Sixth Circuit has held that the apprehension of injuries created by the presence of such things as overhead power lines, for example, is founded upon the practical experience and "may be taken into consideration" in determining market value of the affected land. *United States of America v. 6.24 Acres of Land*, 1996 U.S. App. LEXIS 27761. Diminution of value caused by fear may be recoverable where such fear affects the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, assuming buyers and sellers of ordinary prudence are knowledgeable and are not motivated by speculation or conjecture. *United States of America v. 760.807 Acres of Land*, 731 F.2d 1443 (9th Cir. 1984).

The Defendants offered the expert opinion and testimony of Keilisch and Knapp to calculate damages to the residue resulting from the installation of the pipeline and its easement. Keilisch relied upon Wisconsin studies and older Ohio studies and concluded a reduction in land value of 18% (Defendant's Exhibit 8, pp. 21-37). The Commission found the Wisconsin studies presented to be of only marginal value. The Wisconsin studies are all "small lot" studies, they are geographically distant from Ohio, and they contain no "before and after" appraisals of comparable properties. The five Ohio studies used by Keilisch to justify diminution in value of the residue are addressed individually.

1. Riverside Estates: The calculated range in loss is -5% to -15% with an average loss of -7%. The Commission concludes that the reduction in value range includes contributing factors in addition to the pipeline. A reduction in value by comparison to Riverside Estates is therefore only marginally convincing. Nonetheless, in the view of the Commission, Riverside Estates provides the closest analog to the McCarty property.

8

2. Logsdon Woods: The calculated range in loss is +6% to -44% with an average loss of -14%. However, the width of the easement is 110 feet wide or 120% larger than the subject and the range in loss is extremely wide. A reduction in value using Logsdon Woods is unwarranted.

3. Rolling Meadows: The calculated range in loss is -11% to -16% with an average loss of -14%. The property is already subject to an oil pipeline easement and an overhead High Voltage Transmission Line ("HVTL"). Also, the size of the sample is exceedingly small for reliable regression analysis. In fact, given the analysis, the evidence could be interpreted to support the hypothesis that larger sized sites may actually command a higher land value with the easement than without, a proposition which the Commission also rejects. Consequently, analysis of the Rolling Meadows property provided little evidence to support a reduction in value.

4. Hawthorne Hills: The calculated loss is -13%. The Commission concluded that the 13% adjustment for the HVTL was arbitrary and the Commission could not conclude from the Hawthorne Hills property to what extent Defendants' land had suffered a loss in value. In fact, credible evidence from the Plaintiff dealing with the subsequent sale of adjoining property indicates that the gas easement may have caused no reduction in value.

5. Rolling Knolls: The study was completed by another expert (Jackson) and concluded a loss in value range of -5% to -10% with an average overall loss of -10%. The analysis was based upon an analysis of sales of improved residential properties. Since there has been no evidence of the market value of the homestead improvements, the study was not considered persuasive evidence of a reduction in value.

The survey of real estate agents provided by Mr. Keilisch was not convincing to the Commission. It was admittedly unscientific in both the selection of questions and the selection of those surveyed and the survey questions were very broad in nature. Moreover, it assumed a pipeline was 150 feet from the residence, whereas in the present case, the pipeline is approximately 500 feet from the residence. <u>Moreover, the survey itself indicated that 68% of those surveyed indicated that the pipeline would have no effect on value or an effect of less than 10%.</u>

Knapp indicated that the proximity of a 42-inch natural gas pipeline on the McCarty property as shown on the exhibit would cause their property to be devalued as a result of this "fear factor" or "stigma." Knapp concludes a loss in value of 30% of the fair market value of the property is appropriate.

The McCartys also offered personal testimony regarding the diminution in value indicating a reduction in value of up to 30% for the land area. Particularly, Jeffrey McCarty indicated that the land area south of the easement is significantly damaged. Per testimony of Podolski, the land area south of the easement contains 5.5+/- acres excepting the existing underground utility easement areas.

The conclusions of Knapp and the McCartys are not given great weight by the Commission as the testifying witnesses failed to provide substantial credible evidence to support their opinions. Although the McCartys may have somewhat more expertise than the "typical" homeowner, neither of them were qualified as experts, their expertise is limited, and is to a significant extent outdated.

REX offered the testimony of real estate appraiser Herbig on the issue of damages to the residue. There is no appraisal analysis contained within Herbig's report and he concluded that there is no reduction in value to the property due to the easement by simply referring to a published article (Plaintiff's Exhibit 7) and a Texas pipeline study (Plaintiff's Exhibit 4). Herbig indicated that he relied upon match-pair comparisons and he also analyzed Keilisch's use of the Hawthorne Hills reduction analysis. His rebuttal to the Defendant's Hawthorne Hills' analysis was convincing; however, Herbig offered no additional evidence to support his conclusion that there is no reduction in value to the residue land area.

In summary, REX did not present sufficient evidence to contradict the evidence of some reduction in land value presented by the Defendant. Notwithstanding the relatively unpersuasive nature of the Defendant's conclusions that the residue had suffered some damage, that evidence was not sufficiently rebutted by Plaintiff's expert. Therefore, the Commission concluded that the residue was damaged to some degree. However, it does not find that it was damaged to the degree proferred by Defendant and Defendant's experts. Based upon all of the evidence, the Commission finds that a reduction in value of 7% is applicable for the 57.71 acres lying outside of the Permanent, Non-Exclusive Easement by relying upon The Riverside Estates analysis. Multiplying 7% by $16,000 per acre indicates a reduction in value of $1,120 per acre. The loss in land value is calculated as 57.71 Acres x $1,120 per acre totaling $64,635.2

One of the Commissioners recommends a residue damage reduction of 11% as more applicable for the land areas lying outside the permanent easement. This commissioner gave less credibility to the testimony of Mr. Herbig than the other Commissioners and discounted his testimony more substantially based upon Mr. Herbig's relationship with the Plaintiff and his decision not to consult with the Defendants in doing his appraisal. Therefore, this Commissioner

believes that the evidence viewed as a whole better supports an 11% reduction. The two remaining commissioners did not find these reasons sufficient to significantly discount Mr. Herbig's testimony and conclusions. They concluded that a total loss in value of 7% is appropriate, reasonable, and the maximum amount of compensation that can adduced from the evidence provided. A loss in value of 7% represents the majority opinion of the Commissioners and is the basis for the Recommendation.

   Total Compensation for loss in Land Value to the Residue:  $64,635.20

Farm Losses

Jeffrey McCarty provided testimony regarding a sharecropping agreement to farm the property. The Commission finds the projected income loss attributed to sharecropping farming activity to be too speculative for consideration. The cost of mowing, the loss of fertilizers and the transportation and spreading costs of fertilizer and lost land rent on the other hand are considered to be actual lost costs to the property owner for which compensation is due (Defendant's Exhibit 13). The compensation for farm loss is calculated as follows:

1. Mowing Cost:  $1,875.00
2. Loss of Fertilizers:  $2,357.25
3. Transportation and Spreading Costs of Fertilizers:  $ 415.65
4. Two Years Lost Land Rent ($2,500 Per Year):  <u>$5,000.00</u>

  Total Compensation For Farm Losses:  $9,647.90

## III.  Conclusion and Recommendation

The Commission recommends that the Defendants be compensated in the total amount of $116,811.10, which is allocated as follows between the market value of the Permanent, Non-Exclusive Easement, the market values of the Temporary Easement and the Workspace Area, the diminution in value to the remaining land area located outside the easement area and applicable Farm Losses.

The Market Value of the Permanent, Non-Exclusive Easement is Calculated as follows:

| | |
|---|---|
| Permanent Non-Exclusive Easement: | $ 21,984.00 |
| Temporary Easement: | $ 13,171.20 |
| Work Agreement: | $  7,372.80 |
| Diminution in Land Value to the Residue: | $ 64,635.20 |
| Farm Losses: | $  9,647.90 |
| Total Recommended Compensation Due Owner: | $116,811.10 |

It is so recommended.

/s/ Gregory M. Travalio
Gregory M. Travalio
Commission Chair


/s/  James N. Trifelos
James N. Trifelos
Member


/s/  G. Franklin Hinkle, II
G. Franklin Hinkle, II
Member